## BIG LAKE OIL CO. v. DRISCOLL, Collector of Internal Revenue.

### No. 913.

District Court, W. D. Pennsylvania.

Aug. 29, 1941.

S. Leo Ruslander, James A. Graham, and Samuel Kaufman, all of Pittsburgh, Pa., and Walter J. Brobyn and Edgar J. Goodrich, both of Washington, D.C., for plaintiff.

Charles F. Uhl, U. S. Atty., George Mashank and Elliott W. Finkel, Asst. U. S. Attys., all of Pittsburgh, Pa., Samuel O. Clark, Jr., Asst. Atty. Gen., Andrew D. Sharpe and Courtnay C. Hamilton, Sp. Assts. to the Atty. Gen., and J. S. Hornback, of Washington, D.C., for defendant.

GIBSON, District Judge.

In 1923 the Big Lake Oil Company, the plaintiff, developed an oil field in Reagan County, Texas. From 1924 to 1926 the oil produced was sold to the Reagan County Purchasing Company, a pipe line carrier. Pursuant to its contract with Big Lake, the Purchasing Company constructed a pipe line from its tank farm at Kemper, Texas, to plaintiff's lease. On the lease the Purchasing Company constructed a system of gathering lines running from its main stem to flow tanks at the Big Lake's more than one hundred wells where the oil was delivered to the purchaser.

This condition existed until 1926, when the oil in many of the wells became filled with basic sediment and water of such a nature that ordinary draining at the flow tanks would not bring it up to the standard required by the contract with the Purchasing Company or to the standard required of any pipe line company in Texas. Thereupon the Purchasing Company removed all its lines from plaintiff's property. Following this removal the plaintiff connected its flow tanks with a central treating plant upon its property where the

oil was brought up to standard specifications by heat and the use of chemicals.

Until July, 1934, the treated oil was stored in tanks constructed by plaintiff some distance from the treating plant but upon its own property. After that date it was stored in tanks in the immediate vicinity of the treating plant. Delivery to the Purchasing Company was made from the storage tanks, at which point it was gauged.

The Commissioner of Internal Revenue having exacted a tax from the plaintiff upon the theory that it was a pipe line carrier, and the plaintiff having brought suit to recover the tax so paid, the court is required to determine whether the transfer from the flow tanks to the treating plant and to storage tanks was a conveyance of oil by pipe line as contemplated by the taxing statute, or was a mere incident of the production of oil.

The mere fact of transfer by the owner, and not by a pipe line carrier, is in itself immaterial. Revenue Act of 1932, c. 209, 47 Stat. 169.

■ The Revenue Act of 1932 imposed a tax upon "all transportation of crude petroleum and liquid products thereof by pipe line". Section 731(a), 26 U.S.C.A. Int.Rev.Acts, page 636. This tax, aimed primarily at pipe line carriers for hire, included the transportation to market by pipe line of crude oil by the owner from his storage tanks, or by means of gathering lines from his flow tanks after production. It has in view, however, the services which a pipe line carrier was accustomed to render. The scope of the taxing statute is reasonably shown by Treasury Regulations 42, Art. 26:

"Basis of Tax.—The term 'all transportation of crude petroleum and liquid products thereof by pipe line' includes any such transportation by a carrier, either public or private, whether or not transported for hire, and whether or not the commodity transported is owned by the carrier. It also includes the transportation by private owner whenever the movement is substantially similar to movements which pipe-line carriers usually undertake and perform, if the movement is not merely local or incidental to another business or a related business engaged in by the person so transporting, such as the producing or refining of oil. Thus, where a refiner maintains a trunk line or a gathering line from a refinery to an oil field or pool, the services which the refiner performs for himself are similar to those which pipe-line carriers would otherwise render. The refiner, therefore, should pay the tax as though he had in fact employed the services of a carrier. If, on the other hand, movement is from storage tanks to stills which are a part of the same manufacturing unit, or from wells to flow tanks or storage tanks situated in the immediate vicinity, the movement is not such as a pipe-line carrier would normally render and consequently is not subject to the tax imposed under section 731. The movement by pipe line from leased storage tanks to storage tanks such as are usually maintained in the immediate vicinity of a refinery, railroad siding, or boat wharf, is taxable.

"The gathering service rendered in movements from lease storage tanks to storage tanks or receiving stations at the end of a stem or gathering line is subject to tax.

"The transporting service rendered in movements from the end of the stem or gathering lines through a main or trunk line to a point of delivery is subject to tax.

"Delivery service such as loading into tank cars or tank vessels by means of loading racks is subject to tax when rendered as a continuation or part of a prior taxable service."

By the Regulations it will appear that the transportation of oil by a private owner is taxable "whenever the movement is substantially similar to movements which pipe-line carriers usually undertake and perform, if the movement is not merely local or incidental to another business or a related business engaged in by the person so transporting, such as the producing or refining of oil * * *. If, on the other hand, the movement is from storage tanks to stills which are a part of the same manufacturing unit, or from wells to flow tanks or storage tanks situated in the immediate vicinity, the movement is not such as a pipe-line carrier would normally render and consequently is not subject to the tax imposed under section 731."

■ It seems plain that the transfer of plaintiff's mixture of water, sand and crude oil from the flow tanks to the treating plant was not "substantially similar to movements which pipe-line carriers usually undertake and perform", but was "merely local or incidental to another business or a

512

related business engaged in by the person so transporting, such as the producing or refining of oil". Pipe line companies did not, and could not, carry such mixtures to market. The Purchasing Company in the instant matter removed its gathering lines theretofore extended to plaintiff's wells because it could perform no pipe line service. As it appeared in the flow tanks plaintiff's emulsified, sediment-containing mixture had not been "produced" for market. Not until it was treated did it become that which the plaintiff sought to produce, crude oil ready for delivery to a pipe line. Up to that point its handling had been merely incidental to production.

From the treating plant the product went to storage tanks. After July, 1934, the oil went to six storage tanks in the immediate vicinity of the treating plant, and prior thereto to tanks situated some distance from it but upon plaintiff's lease. This was a mere storage, comparable to the transfer of oil from the mouth of the well to the flow tanks. Pipe line service began upon delivery to the Purchasing Company for transportation to market.

Judgment will be entered in favor of the plaintiff. A certificate of probable cause may be presented.